IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

TYRONE D. ARDS,

                    Plaintiff,

      v.

THEODORE ANDERSON,
RANDY SCHNEIDER,
MICHAEL J. THOMPSON,
PATRICK STELLICK, and
MAURY THILL,

                  Defendants.

OPINION & ORDER

16-cv-341-jdp

---

        Pro se plaintiff Tyrone D. Ards, a state prisoner now incarcerated at the Wisconsin Secure Program Facility (WSPF), is proceeding against correctional officers at his previous prison, the Columbia Correctional Institution (CCI).

        The case arises from an incident in which Ards apparently attempted to hang himself in the restrictive housing unit at CCI. Despite the fact that Ards was on suicide watch, he was given a bed sheet, with which he contends he hung himself. In the cell extraction and strip search that followed the hanging, Ards contends that he was subjected to excessive force that caused him enduring injuries.

        Defendants move for summary judgment, despite that fact that the record is full of genuine factual disputes about what actually happened and why the defendants did what they did. Leaving a suicidal man in solitary confinement with a bed sheet knowing that he might hang himself with it can be cruel and unusual punishment. And although prison staff can use force on an unresponsive inmate for safety reasons, the force cannot be excessive. A reasonable jury could find that defendants Thompson and Stellick disregarded Ards's risk of suicide, that

Schneider and Thill used excessive force, and that Anderson ignored the use of excessive force. I will deny defendants' motion for summary judgment.

Ards has filed nine motions, including a motion for assistance in recruiting counsel. I will attempt to recruit counsel who is willing to represent him. I will address his other motions below.

## PRELIMINARY MATTERS

I begin with a few preliminary matters. First, I will not entertain new claims at summary judgment. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012) ("[A] plaintiff 'may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.'" (quoting *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002))). Ards says defendants subjected him to a humiliating strip search on April 26, but this is not a claim that he raised in his complaint, so I will not assess whether the strip search was unlawful.

Second, Ards moves for reconsideration of Magistrate Judge Steven Crocker's order extending the deadline for defendants' summary judgment motion. Dkt. 76. Setting deadlines is a matter committed to the court's discretion, *see Gonzalez v. Ingersoll Mill. Mach. Co.*, 133 F.3d 1025, 1030 (7th Cir. 1998), and I will deny defendants' summary judgment motion on the merits, so Ards has suffered no prejudice from the extension. Ards's motion for reconsideration is denied.

Third, Ards moves to strike the declaration of Lon Becher. Dkt. 99. Becher's declaration authenticates Ards's medical records, describes the redness on his neck caused by the April 26 incident, and suggests that Ards suffered no severe injury from hanging himself. Dkt. 84, ¶¶ 6–11. Ards contends that I should exclude Becher's declaration because

defendants failed to disclose Becher as a witness by the deadline for disclosing experts. But regardless of whether Becher is an expert or whether the disclosure is untimely, Ards suffered no prejudice. Whether Ards suffered severe, physical injury on his neck does not preclude his deliberate indifference claims or otherwise affect the analysis below. Ards's motion to strike is denied.

Fourth, Ards moves to compel production of color copies of his neck injury and to sanction prison officials for failure to produce those photographs. Dkts. 112–13. The court has received those photographs in color, so I will deny Ards's motions as moot.

The last preliminary issue. Ards moves for leave to file a sur-reply brief in opposition to defendants' summary judgment motion. Dkt. 125. He has filed a proposed sur-reply brief. Dkt. 129. I will grant his motion and consider his arguments in the sur-reply brief.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Ards has a history of self-harm and suicide attempts. He refused to eat or drink in numerous instances between 2014 and 2017, and prison officials obtained court orders to force-feed him. He alleges that he attempted to overdose on medicine in July 2014, April 2015, June 2015, August 2015, October 2016, March 2017, April 2017, and December 2017. Dkt. 61, at 2; *Ards v. Saylor*, No. 17-cv-458, Dkts. 1, 50. This is not an exhaustive list. Some prison officials found Ards's suicidal ideations credible; others saw them as attempts to manipulate prison staff. *See, e.g.*, Dkt. 90-1, at 11, 15.[1]

---

[1] Ards's PSU records indicate that, as of April 10, 2014, he had no clinical diagnosis or any history of mental health treatment despite his past self-harm attempts. Dkt. 90-1, at 24. Ards states in his own declaration that he has been diagnosed by prison staff at his current prison,

This case arises from an incident during Ards's confinement in the Restrictive Housing Unit (RHU) at CCI. On April 25, 2014, Ards informed prison staff that he had thoughts of killing himself. A psychologist and a correctional officer at CCI found Ards "credible" and placed him on "close" observations status at 6:30 p.m. Dkt. 90-1, at 15. Close observation status usually requires correctional officers to observe the inmate every 15 minutes and record what they observe in an observation log. In Ards's case, prison officials decided to have Ards observed every five minutes. His property was restricted to a suicide-resistant smock, a security mattress, a soap, a washcloth, bag meals, toilet paper, paper forms for requesting health or psychological services, and a crayon. He was confined in his own cell because the cells designated for inmates on observation status were already occupied.

## A. Suicide attempt

The parties agree that defendant Michael J. Thompson gave Ards a bed sheet on April 26 sometime around 6:30 p.m., during defendant Patrick Stellick's shift to conduct observation checks on Ards. They also agree that between 7:15 p.m. and 7:45 p.m., Ards told Stellick multiple times that he was suicidal, and in one instance, he asked to see a clinician from the Psychological Services Unit (PSU). No PSU clinician came to Ards's cell, and Stellick later discovered Ards lying motionless on the floor around 8:00 p.m. The parties dispute the details of what happened between 6:30 p.m. and 8:00 p.m.

---

WSPF, with antisocial personality disorder and adjustment disorder, which do not necessarily lead to suicidal ideations. No. 17-cv-458, Dkt. 13, ¶ 10. WSPF staff have confirmed these diagnoses. No. 17-cv-458, Dkt. 58-1. Ards disputes the quality of the psychological services that he received at WSPF. No. 17-cv-458, Dkt. 13, ¶¶ 11–20. According to Ards, his mental illnesses are caused by extended confinement in segregation. *Id*. ¶ 10. Ards's actual diagnoses are not material.

At about 6:30 p.m., Thompson was on sheet-exchange duty, and he was collecting used bed sheets from inmates in exchange for clean sheets. Ards did not have a used bed sheet, but Thompson gave him a new sheet anyway. Dkt. 106-6, ¶ 21; *see also* Dkt. 39, ¶ 21. Ards asked Thompson in an interrogatory why he gave him a sheet when he did not have a used one, but Thompson did not recall the reason. Dkt. 106-1, ¶ 22. The parties agree that Ards was not allowed to have a bed sheet while he was on close observation status.

Thompson says he gave Ards the bed sheet by mistake. He was new to the job: he had been working at CCI for about a month, and he had never worked in the RHU. Thompson also says he did not know that Ards was on observation status: Ards was confined in his own cell, instead of a cell designated for observation status. On the other hand, Ards's observation log indicates that Thompson performed five-minute observation checks on Ards on that day before giving him the bed sheet. He had performed the observation checks between 11:43 p.m. April 25 and 12:33 a.m. April 26, and again between 3:35 a.m. and 6:00 a.m. on April 26. Thompson also wrote on the observation log describing what Ards was doing during the observation checks and signed his name on the observation log. Dkt. 85-1, at 11–15. The cover page of the observation log indicates that Ards was on clinical observation. *Id*. at 5. When Thompson gave Ards the bed sheet, Ards was wearing a suicide-resistant smock. Dkt. 106-4, ¶ 16. Ards's cell door also had a magnet that said "OBS." Dkt. 121, ¶ 6.

Thompson also denies knowing that Ards was not supposed to have a bed sheet. Ards, on the other hand, states in his declaration that he told Thompson that he was suicidal and that he would hang himself with the bed sheet when Thompson gave the sheet to him. Dkt. 106, ¶¶ 11, 13. Ards also adduces a declaration of James J. Davis, an inmate who was confined in a cell across the hall from Ards's cell. Davis states in his declaration that Davis

himself told Thompson after Ards got the bed sheet that Ards was not supposed to have a sheet. Dkt. 107, ¶¶ 2–4. According to Davis, Thompson replied, "Oh, he's alright nobody wants to be cold," and walked away. *Id*. ¶¶ 5–7.

Stellick was another correctional officer who performed the five-minute observation checks on Ards. On April 26, Stellick performed the observation checks between 2:05 p.m. and 10:00 p.m. Dkt. 85-1, at 20–25. At 7:15 p.m., Ards told Stellick that he had thoughts of hanging himself and that he wished to see a PSU clinician. At 7:35 p.m., Ards told Stellick that he had "strong urges to self-harm." Dkt. 85, ¶ 17. At 7:45 p.m., Ards warned Stellick again, but neither Ards nor Stellick describes what Ards said at 7:45 p.m. Davis says in his declaration that he heard Ards telling Stellick that "the next round he would be dead." Dkt. 107, ¶ 13.

Stellick says that after each time Ards warned him about suicidal ideations, he informed one of his supervisors. Stellick says after the first and second warnings, he informed the shift sergeant, but he does not give the shift sergeant's name. Defendant Randy Schneider says he was the shift sergeant at the time, Dkt. 87, ¶ 5, but he does not say in his declaration that Stellick informed him about Ards's suicide risk, *see id*. Instead, Schneider says Stellick contacted him around 8:10 p.m. when Stellick discovered Ards lying on the floor unresponsive. *Id*. ¶ 6. Stellick says after the third warning, he called a shift captain; again Stellick does not give the captain's name. Stellick says that the shift captain told him that the captain contacted clinical staff. According to Ards, Timothy Casiana, one of the defendants whom I dismissed earlier in the case, was the captain on duty, but when Ards asked Casiana in an interrogatory why he did not report Ards's suicide risk, Casiana did not recall being informed about Ards's suicidal statements. Dkt. 106-1, ¶ 9. All defendants except Thompson adduced incident reports that they prepared for the April 26 incident. Dkt. 85-2 (Stellick's incident report); Dkt. 86-1

(Thill's incident report); Dkt. 87-1 (Schneider's incident report); Dkt. 88-2 (Anderson's incident report). None of the incident reports indicates that Stellick informed the shift sergeant or the shift captain. The parties agree that no one from the PSU came to Ards's cell during the evening of April 26, even after Stellick found Ards lying on the floor. Stellick does not say that he took any action other than informing a supervisor.

Stellick denies that he knew that Ards had a bed sheet. Ards admitted during his deposition that he did not tell Stellick that he had the bed sheet. Dkt. 123 (Ards Dep. 38:13–14). The observation log indicates that Stellick conducted an observation check around 6:30 p.m., the approximate time when Thompson was on sheet-exchange duty. (The precise time when Thompson gave Ards the bed sheet is unclear.) Stellick did not have a constant view of Ards's cell during his observation shift because he continually patrolled various tiers of the RHU to check other inmates. Dkt. 85, ¶ 11. On the other hand, inmate Davis states in his declaration that he told Stellick that Ards had a bed sheet and that Ards was talking about hanging himself. Dkt. 107, ¶ 11.

The parties dispute whether Ards actually hung himself. Ards says he hung himself with the bed sheet by tying one end of it to a vent in his cell and the other end to his neck. He says after he hung himself, he suffocated to the point where he lost consciousness, but the sheet got loose and detached from the vent. Dkt. 106, ¶ 17; Dkt. 123 (Ards Dep. 41:16–23). Defendants point out that Ards's allegation in his amended complaint that he "was lying motionlessly on the floor" does not establish that he hung himself. Dkt. 120, ¶ 13 (citing Dkt. 8, ¶ 18). They argue that because Ards verified his amended complaint under penalty of perjury, his allegation is a prior testimony that contradicts his current testimony that he hung himself. Dkt. 120, ¶ 13 (citing Dkt. 8, ¶ 18). But Ards alleges elsewhere in the amended

complaint that he did hang himself. Dkt. 8, ¶ 14 ("[P]laintiff hung himself and was able to [suffocate] himself, with the bed sheet"). And the allegation about lying on the floor does not contradict the proposition that he first hung himself. Defendants also contend that the bed sheet was loosely wrapped around his neck when Stellick discovered Ards. But depending on how Ards tied the knot, he could hang himself on a noose larger than his neck, and the proposition that the sheet was loosely wrapped around his neck when he was discovered does not contradict Ards's testimony that it choked him earlier.

The precise time when Ards attempted to hang himself is unclear, but Stellick says, at 8:05 p.m., he returned to Ards's cell for another observation check and found Ards lying on the floor with a bed sheet wrapped around his neck. He saw Ards's chest rise and fall, from which he inferred that Ards was breathing. Stellick spoke to Ards, but he did not respond. Stellick then notified Schneider that Ards was unresponsive.[2] Davis tells a slightly different version of what happened around 8:00 p.m. He says that he saw Stellick at 8:00 p.m. in front of Ards's cell with a shocked facial impression and looking into Ards's cell. Dkt. 107, ¶ 15. Davis says Stellick then left and he returned to Ards's cell with Schneider at 8:05 p.m. *Id*. ¶ 19. The parties agree that after Stellick discovered Ards and contacted Schneider, Schneider then contacted defendant Theodore Anderson telling him that Ards was found unresponsive. Dkt. 85, ¶ 21

---

[2] Defendants say in their proposed findings of fact that Stellick informed not only Schneider, but also defendant Maury Thill. Dkt. 119, ¶ 47. Thill says in his declaration that Stellick contacted him. Dkt. 86, ¶ 6. But Stellick says in his declaration that he contacted Schneider; he does not say that he contacted Thill also. Dkt. 85, ¶ 21. For the purposes of this opinion, I will rely on Stellick's declaration. Whether Stellick contacted Thill in addition to Schneider is not material at this point in the case.

## B. Emergency cell entry and use of force

The parties agree that Anderson assembled an emergency cell-extraction team and that the team extracted Ards from his cell using some level of force in the process. They also agree that the team escorted Ards to a dayroom for questioning, that a group of correctional officers carried Ards to a shower area, and that at the shower area, the officers conducted a strip search on Ards. Below are the details.

The cell extraction team included seven members: Anderson himself, Thill, Stellick, and Schneider, and three other non-defendant correctional officers. Dkt. 91, ¶ 15. Once the extraction team arrived at Ards's cell, Anderson ordered Ards to open the cell door, but Ards did not respond. Ards testified that he was unconscious at this point. Dkt. 123 (Ards Dep. 41:16–42:5). Then Schneider, Thill, and Stellick entered Ards's cell. Dkt. 119, ¶ 63. The cell extraction was not recorded on video, even though the Division of Adult Institution requires prison staff to video-record uses of force. Dkt. 106-9, at 3. Defendants say that the cell extraction was not recorded because it was an emergency.

Inside Ards's cell, Schneider used a plexiglass shield to restrain Ards. Correctional officers are trained to place a plexiglass shield on an inmate during an emergency cell extraction to restrict the inmate's movement and to prevent the inmate from harming the officers or himself. Dkt. 87, ¶ 11; *see also* Dkt. 89-2 (photographs of a plexiglass shield). Schneider says he "stabilize[d]" Ards against the floor by placing a plexiglass shield on his back. Dkt. 87, ¶ 11. Ards says Schneider "jumped" on his back with the shield, and the force from this jump caused him to regain his consciousness. Dkt. 106, ¶ 23 and Dkt. 123 (Ards Dep. 41:22–23). If Ards was unconscious until Schneider used the shield on his back, Ards would lack personal knowledge whether Schneider actually jumped on him. Ards testified during his deposition that

he suffered an injury due to Schneider using the shield on his back, Dkt. 123 (Ards. Dep. 7:6–8:16), so I take Ards to be saying that Schneider placed the shield on his back with such force that it felt like Schneider jumped on him. While Schneider was on Ards's back, other officers placed restraints on Ards's legs.

Thill says he restrained Ards's right arm and ordered him to present his left arm so Thill could apply wrist restraints. According to defendants, Ards "refused" to follow Thill's orders and resisted by keeping his left arm under his body. *See, e.g.*, Dkt. 119, ¶ 67. Earlier in this case, Schneider admitted in a response to Ards's request for admission that Ards's left arm was under his body when the officers entered the cell. Dkt. 39, ¶ 20. Ards says having Schneider's weight on top of him prevented him from moving his left arm, Dkt. 106, ¶ 24, and that he did not recall Thill asking him to present his left arm, Dkt. 123 (Ards Dep. 65:3–5). On the basis that Ards refused to comply with the orders that he present his left arm, Thill applied a "compliance hold" on Ards's right wrist by bending the wrist. Dkt. 86, ¶ 10. The parties agree that a compliance hold causes pain. Thill says Ards presented his left arm after the compliance hold, *id*. ¶ 11; Ards says he could present his left arm at this point because Schneider reduced some of the pressure on his back. Dkt. 123 (Ards. Dep. 65:3–5). The officers then placed restraints on Ards's wrists, and Schneider cut the bed sheet that was wrapped around his neck.

Ards says Schneider and Thill caused him injuries during the cell extraction. He testified that he had been taking Tylenol and ibuprofen for the injuries on his lower back and right wrist on the day of his deposition, September 5, 2017, even though the incident occurred more than three years ago, on April 26, 2014. Dkt. 123 (Ards. Dep. 7:6–8:16).

After the cell extraction, the officers escorted Ards to a dayroom, sat Ards on a chair, and questioned him about his injuries. Anderson asked Ards whether he was injured, and Ards

did not respond. Anderson says he observed two small red marks on Ards's neck and that he took photographs of Ards's neck. Dkt. 88, ¶ 25; *see also* Dkt. 88-1 (photographs of Ards's neck); Dkt. 123 (Ards. Dep. 42:19–22).

Anderson and other correctional officers then escorted Ards to a shower area for a strip search to check Ards's body for contraband. Thill, Anderson, Stellick, and Schneider were present during the strip search. *See* Dkt. 86, ¶ 14 (Thill); Dkt. 88, ¶ 26 (Anderson); Dkt. 85, ¶ 28 (Stellick); Dkt. 87, ¶ 17 (Schneider). Thompson was in the control bubble, where he could see the strip search. Dkt. 91, ¶ 16; Dkt. 106-5; Dkt. 106-11, ¶ 18. It is not clear whether anyone else was present.

The strip search was not video recorded. Ards asked Schneider in an interrogatory why Anderson had a chance to grab a camera to take photographs in the dayroom but not a chance to record the strip search; Schneider did not know. Dkt. 106-11, at 5.

The parties dispute what happened during the strip search. Ards says he did not refuse any order given by the officers; defendants say that Ards remained unresponsive and ignored the officers' orders when they tried to get Ards to conduct a self-directed strip search, which would allow him to remove his own clothes and move his own body parts with no physical contact with an officer. Stellick says once Ards and the officers arrived at the shower area, Ards was tethered to a door, Dkt. 85, ¶ 28, and Stellick admitted earlier in the case in a response to Ards's request for admission that an inmate cannot comply with a strip search with his hands cuffed beyond his back, Dkt. 106-5, ¶ 14. Defendants say that because Ards failed to respond, they carried out a staff-assisted strip search, which meant that an officer removed Ards's clothes and moved his body parts. Schneider conducted the staff-assisted strip search on Ards.

Ards says that during the strip search, Schneider shoved a metal-mesh glove into his mouth and slammed his head against a metal door. Dkt. 106, ¶ 37. Defendants agree that Schneider wore a metal-mesh glove and put his hand wearing the glove in Ards's mouth. *See* Dkt. 89-2 (photographs of metal-mesh gloves). They say that the glove was meant to protect an officer's hand against an inmate biting the hand or other potential injury caused by any contraband hidden inside the mouth. Schneider admits that the use of a metal-mesh glove is not part of the prison's policy. Dkt. 106-4, ¶ 11. Defendants say that Schneider put his hand in Ards's mouth wearing the metal glove because Ards refused to comply with the officers' orders to open his mouth. Ards says he did not refuse any order from the officers. Dkt. 106, ¶¶ 36, 46.[3]

As for slamming Ards's head against a metal door, defendants deny that it happened at all. Dkt. 120, ¶ 27. Ards says it did happen. Dkt. 106, ¶ 37 and Dkt. 123 (Ards. Dep. 43:2–22).

Ards was released from observation status on April 29, 2014. After the incident, Schneider filed a conduct report against Ards on the basis that Ards "created a risk of serious disruption at the institution or in the community." Dkt. 106-8, at 2. A disciplinary hearing committee held an evidentiary hearing, but Ards refused to attend. After reviewing evidence, the disciplinary hearing committee found Ards not guilty. The committee noted, "Offender was in OBS status for thoughts of self-harm and was not in the right frame of mind to not act on his thought of self-harm." *Id*. at 1.

---

[3] Schneider admits that the gloves were handed to him by someone. Dkt. 106-11, ¶ 16. In a request for admission, Ards asked Schneider to admit that Thompson gave him the gloves, but Schneider responded that he does not recall who gave him the gloves. Dkt. 106-4, ¶ 4.

ANALYSIS

## A. Defendants' motion for summary judgment

Ards is proceeding on four sets of claims under the Eighth Amendment:

1. deliberate indifference claims against Stellick and Thompson for ignoring threats of suicide;

2. a deliberate indifference claim against Thompson for giving Ards a bed sheet, intending for Ards to use the sheet to hang himself;

3. excessive force claims against Schneider and Thill for jumping on his back, bending his wrist, slamming his head against a metal shower door, and shoving a hand wearing a metal glove into his mouth; and

4. a failure to protect claim against Anderson for failure to protect Ards from Schneider's and Thill's excessive force.

Defendants move for summary judgment on all claims. A court must grant summary judgment when no genuine issue of a material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The court must view the evidence in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court's role at summary judgment is to decide "whether, based on the evidence of record, there is any material dispute of fact that requires a trial," not "to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *D.Z. v. Buell*, 796 F.3d 749, 756 (7th Cir. 2015) (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)).

### 1. Suicide-threat claims

Under the Eighth Amendment, a correctional officer has an obligation to intervene and take reasonable measures to prevent an inmate from harming himself. *See, e.g., Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). The familiar deliberate indifference standard applies "[w]here the harm at issue is a suicide or attempted suicide," and the plaintiff must

show "(1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006). Here, the parties dispute both elements.

### a. Objectively serious harm

Defendants contend that Ards suffered no actionable harm because his injury from hanging himself is limited to some redness on his neck. An actionable harm under the Eighth Amendment need not inflict physical harm, and even if that were a requirement, Ards has adduced evidence that he suffered serious physical injury.

Generally, the requirement for objectively serious harm is easily satisfied in prison suicide cases. *See, e.g.*, *Sanville*, 266 F.3d at 733 ("It goes without saying that '[s]uicide is a serious harm.'" (citations omitted)). This case differs slightly from those cases for the obvious reason that Ards did not succeed in his suicide attempt. Still, an actionable harm under the deliberate indifference standard need not inflict physical injury; psychological harm, extreme indignities, or "heightened risk of future injury" can all violate the Eighth Amendment.[4] And the Seventh Circuit has not held, as far as I am aware, that a prisoner exposed to suicide risk cannot assert a deliberate indifference claim just because he did not succeed in his suicide attempt.

---

[4] *See, e.g.*, *Mathews v. Raemisch*, 513 F. App'x 605, 607 (7th Cir. 2013) ("[T]he district court was wrong to suggest that the plaintiffs needed to show something beyond psychological harm."); *Hope v. Pelzer*, 536 U.S. at 738 ("[T]he 'basic concept underlying the Eighth Amendment . . . is nothing less than the dignity of man.'" (quoting *Trop v. Dulles*, 356 U.S. 86, 100 (1958)); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) ("[H]eightened risk of future injury from living in an infested jail is itself actionable."); *Wright v. Miller*, 561 Fed. Appx. 551, 555 (7th Cir. 2014) ("Even without an actual injury, the mere probability of the harm to which [an inmate is exposed] can be sufficient to create liability.").

Viewing the facts in the light most favorable to Ards as required, I conclude that a reasonable jury could find that Ards suffered an objectively serious harm. Ards, a suicidal inmate, was left in a solitary confinement with a bed sheet with which he could hang himself. Ards asked to see a PSU clinician, but no clinician came. He warned Thompson and Stellick about his suicidal ideations, but they did not intervene, and he attempted suicide. These facts, if proven true, could persuade a jury that Ards suffered considerable psychological harm. If he was so disturbed that he was on suicide watch and that he asked for clinical help but instead was handed a noose to commit suicide, from someone who was responsible for ensuring his safety, that is an actionable psychological harm. It is also obvious that he faced a heightened risk of suicide when he was given the means to hang himself.

Even under defendant's own standard of actionable harm, whether Ards suffered a serious physical injury is genuinely disputed. Ards contends that he could not eat his meals for weeks due to his injury on his neck. His medical record shows that on April 30, a nurse instructed Ards on how to eat his meals despite his throat pain, namely that he should take small bites and chew thoroughly. *See* Dkt. 84-1, at 8; *see also* Dkt. 106, ¶ 53. A reasonable jury could find that Ards's throat injury that caused difficulties swallowing his meals was objectively serious.

Defendants rely on *Whitelaw v. Kootz* for the proposition that a bed sheet did not pose a serious risk. No. 17-cv-111, 2017 WL 448599 (E.D. Wis. Feb. 2, 2017). In *Whitelaw*, the court dismissed an inmate's claim at screening when he alleged that while on observation status, he tried to hang himself with a pair of socks. 2017 WL 448599, at *2. The court explained, "[A] pair of socks . . . is not so inherently dangerous that it should be considered an implement of suicide or self-harm." *Id*. According to defendants, "[l]ike the plaintiff in *Whitelaw*, there is

no suggestion that there was anything within the cell from which Ards could have hanged himself with the sheet." Dkt. 82, at 17. I am not persuaded. A pair of socks and a bed sheet are fundamentally different objects, and inmates have hung themselves with bed sheets. *See, e.g.*, *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). Ards testified that he hung himself from a vent in his cell, and defendants have not adduced evidence that Ards could not have tied the bed sheet to the vent. *Whitelaw* does not apply here.

Perhaps defendants' real message in relying on *Whitelaw* is that the court should not allow Ards to abuse the litigation process with frivolous suicide threats. They quote *Whitelaw* and say that allowing "obvious but misguided attention-seeking behavior to blossom into a federal lawsuit would serve no one's interest." Dkt. 82, at 16 (quoting *Whitelaw*, 2017 WL 448599, *3). It is not lost on me that this kind of lawsuit is ripe for abuse. An inmate can harass prison staff with lawsuits after frivolous suicide threats, as defendants point out. Still, whether the plaintiff is being truthful is a common concern in many cases, and the court cannot assess witnesses' credibility at summary judgment. *See, e.g.*, *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014) ("Sometimes . . . the credulity of a particular litigant makes our task of suspending factual and credibility determinations difficult, but whatever the difficulty, we must stick to the task on summary judgment."). This case is no different.[5] And if defendants believe

---

[5] If anything, I have an obligation to read Ards's submissions generously. *See, e.g.*, *Donald v. Cook Cty. Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996) ("Not only is the district court to view the pro se complaint with an understanding eye, . . . it is incumbent on it to take appropriate measures to permit the adjudication of pro se claims on the merits."); *cf. Perez v. Fenoglio*, 792 F.3d 768, 784–85 (7th Cir. 2015) ("We are reminded that prisoners have been stripped of virtually every means of self-protection and foreclosed from access to outside aid. District courts should remain cognizant of the common law adage that the public is required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994))(quotation marks and internal alterations omitted)).

that Ards is a faker, they had an opportunity to gather evidence to prove that point, and they can convince the jury of their version of facts at trial. I will stick to the summary judgment standard at this point, as I must.

Ards has adduced admissible evidence that he attempted suicide on April 26. His verified complaint, declaration, and deposition testimony indicate that he hung himself with the bed sheet that he got from Thompson, Dkt. 8, ¶ 14; Dkt. 106, ¶¶ 16–17; Dkt. 123 (Ards Dep. 41:16–23), and Thompson admits giving him the bed sheet, Dkt. 91, ¶ 8. When Ards was placed on observation status, at least one psychologist and one correctional officer found Ards's suicide threat credible. *See* Dkt. 90-1, at 15–18. Ards's medical records indicate that the bed sheet caused some redness on his neck and difficulties swallowing meals. Dkt. 84-1, at 3–4, 8. Ards has adduced admissible evidence in support of his side of the story.

Defendants are not entitled to summary judgment on the basis that Ards suffered no objectively serious harm or that he did not actually attempt suicide.

### b. Thompson's deliberate indifference

Ards claims that Thompson gave him a bed sheet intending for him to use it to hang himself and that Thompson ignored Ards's suicide risk. Thompson contends that he was not deliberately indifferent because (1) he gave Ards the bed sheet by mistake; and (2) Ards did not tell Thompson that Ards was suicidal. Both facts are genuinely disputed.

To show deliberate indifference, the plaintiff must show that "the defendant (1) subjectively knew the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded the risk." *Collins*, 462 F.3d at 761. An allegation that the defendant "should have been aware" is not enough; the defendant must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

must also draw the inference." *Estate of Novack ex rel. Turbin v. Cty. of Wood*, 226 F.3d 525, 529 (7th Cir. 2000) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). "If the state officers can observe or are told that their detainee is indeed so disturbed that his next step is likely to be suicide, and yet they do nothing, it is fair to say that they have gone beyond mere negligence and entered the territory of the deliberately indifferent." *See Miller v. Harbaugh*, 698 F.3d 956, 963 (7th Cir. 2012). If doing nothing to prevent a suicide attempt can establish deliberate indifference, affirmatively aiding such an attempt by providing means to do it can certainly establish deliberate indifference.

Thompson contends that he gave Ards a bed sheet by mistake because he did not know that Ards was on observation status. The record indicates otherwise. Before giving Ards a bed sheet, Thompson had conducted observation checks on Ards between 11:43 p.m. and 12:33 a.m., and again between 3:35 a.m. and 6:00 a.m. Dkt. 85-1, at 11–15. Thompson does not explain why he thought he had to watch Ards at midnight and early in the morning if it wasn't because he was on a suicide watch. Thompson also signed his name on the observation log that said Ards was on clinical observation, *id*. at 7, and Ards's cell door had a magnet that said "OBS" as a reminder, Dkt. 121, ¶ 6.

Thompson contends that he gave Ards a bed sheet by mistake also because he did not know that Ards was not supposed to have a bed sheet. Ards says in his declaration that he told Thompson that he would hang himself with the bed sheet. Dkt. 106, ¶¶ 11. Davis says in his declaration that he told Thompson that Ards was not allowed to have a bed sheet. Dkt. 107, ¶ 4. Defendants do not object to these statements' admissibility. Dkt. 119, ¶ 33; Dkt. 120, ¶ 10. Nor do they deny that Thompson heard Davis telling him that Ards could not have a bed sheet. They instead argue that Thompson heard Davis only *after* he gave Ards the bed sheet.

Dkt. 119, ¶ 10. But Thompson could have retrieved the bed sheet after being warned by Davis, so the fact that Davis informed Thompson after giving Ards the sheet is not material. A reasonable jury could find that Thompson knew that Ards was not supposed to have a bed sheet.

Circumstantial evidence further supports the inference that Thompson knew that Ards was not supposed to have a bed sheet. The definition of clinical observation makes clear that an inmate placed on observation is either mentally ill or poses a danger to himself or others:

> A non-punitive status used for the temporary confinement of an inmate to ensure the safety of the inmate or the safety of others. An inmate may be placed in clinical observation for mental illness and dangerousness to self or others, or (when not mentally ill) for dangerousness to self. Clinical observation is also known as "Mental Health Placement" or "Observation for Mental Health Purposes" per Wisconsin Administrative Code Ch. DOC 311

Dkt. 89-1, at 1 (DAI Policy 500.70.24). Thompson was on observation duty and signed the observation log that said Ards was on clinical observation. Ards also did not have a used bed sheet when Thompson gave the bed sheet to him. The jury could infer that Thompson knew that Ards was either mentally ill or posed a danger and that Thompson knew that he was not supposed to give a bed sheet to Ards.

Thompson also contends that Ards did not tell him that he was suicidal. Ards says in his declaration that he did. Dkt. 106, ¶ 11 ("While in the process of getting the bed sheet I informed officer Thompson I was going to hang myself with this bed sheet."). A reasonable jury could find that Ards told Thompson about his suicidal ideations.

Whether Thompson gave Ards a bed sheet by mistake and whether Ards told Thompson that he was suicidal are material facts. If Thompson gave Ards the bed sheet despite the explicit

warning that he would hang himself with it, a reasonable jury could conclude that Thompson was deliberately indifferent to Ards's safety. I will deny summary judgment as to Thompson.

### c. Stellick's deliberate indifference

Stellick admits that Ards told him about suicidal ideations, but he contends that he was not deliberately indifferent because (1) he did not know that Ards had a bed sheet; and (2) he reported to his supervisors each time he heard suicidal statements from Ards. These facts, too, are genuinely disputed.

First, Ards has adduced evidence that Stellick knew that Ards had a bed sheet. Ards testified that he did not tell Stellick that he had it. Dkt. 123 (Ards Dep. 38:13–14). But Davis says in his declaration that Davis himself told Stellick that Ards had a bed sheet. Dkt. 100, ¶ 18. Defendants do not object to the admissibility of Davis's statement. Dkt. 119, ¶ 42.

Aside from Davis's declaration, circumstantial evidence supports the inference that Stellick knew that Ards had a bed sheet. Stellick was on observation duty when Thompson gave Ards the sheet. Even though Stellick did not have a constant view of Ards's cell, when he did the observation checks, he could see Ards's bed, where Ards kept the bed sheet, according to Ards's deposition testimony. Dkt. 123 (Ards Dep. 37:4 ("The sheet was on my bed.")); *see also* Dkt. 123-1 (Diagram of Ards's cell). And even if Ards had hidden the sheet out of Stellick's view, Stellick wrote on Ards's observation log that Ards "said thoughts 'of *hanging* himself.'" Dkt. 85-1, at 23 (emphasis added). The jury could find that this statement informed Stellick that Ards had the means to hang himself. These facts, taken together, could convince a reasonable jury that Stellick knew that Ards had the bed sheet.

The second dispute as to Stellick is whether he responded adequately to Ards's warnings. Stellick contends that he was not deliberately indifferent because he informed a

supervisor each time he heard a suicidal statement from Ards. But whether he informed a supervisor is genuinely disputed. Ards testified during his deposition that no help came before he attempted suicide. Dkt. 123 (Ards Dep. 52:17–53:2). About 45 minutes had passed when Stellick discovered Ards lying on the floor around 8:00 p.m. since the first time Ards told Stellick about his suicidal thoughts at around 7:15 p.m. The fact that no help came for 45 minutes before the suicide attempt supports the inference that Stellick did not inform his supervisors.

Even if Stellick had informed his supervisors, the jury could still find that Stellick's responses showed deliberate indifference. Stellick walked away from Ards's cell after each of the three instances. A reasonable jury could infer that Stellick ignored an emergency when he decided to walk away. Once "aware of the alleged risk, failing to determine what was going on in [Ards's] cell could easily be considered egregious enough to rise to the level of deliberate indifference." *Sanville*, 266 F.3d at 739. Although defendants argue that Stellick relied on his supervisors' judgment, they adduce no evidence that the supervisors instructed Stellick to move onto the next observation check. Indeed, Schneider and Casiana are silent as to what they told Stellick. Genuine issues of material facts preclude summary judgment as to Stellick.

### 2. Excessive force claims

Ards asserts excessive force claims against Schneider and Thill. He alleges that: (1) Schneider jumped on his back with a plexiglass shield during the cell extraction; (2) Thill bent his right wrist during the cell extraction; (3) Schneider slammed his head against a metal door during the strip search; and (4) Schneider shoved a metal mesh glove into his mouth during the strip search. Defendants contend that they were justified in using force to ensure

the safety of Ards and others. They also dispute that they used force in ways described by Ards. Genuine disputes of material facts preclude summary judgment.

The central question in evaluating an excessive force claim under the Eighth Amendment is whether the defendant applied force "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. 1, 6–7 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)). To answer that question, courts consider (1) the need for force; (2) the amount of force used; (3) the threat reasonably perceived by the officer; (4) efforts made to temper the severity of the force; and (5) the extent of the injury caused by the force. *Forrest v. Prine*, 620 F.3d 739, 744 (7th Cir. 2010) (quoting *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009)). An inmate disobeying an order can justify using *some* force to induce compliance, but even the force used in that context cannot be excessive.[6]

Here, a reasonable jury could find that Schneider and Thill used force maliciously and sadistically to cause harm. As for Schneider pressing a plexiglass shield on Ards's back, Ards testified that it caused an injury for which he took medicine for three years after the incident. Dkt. 123 (Ards Dep. 7:6–8:16). Defendants contend that Schneider used the shield because Ards posed a threat to himself and to others. But Ards testified that he had just attempted

---

[6] *Compare Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) (reasoning that applying "modest force" against an inmate who refuses to comply with orders does not violate the Eighth Amendment), *with Hill v. Shelander*, 992 F.2d 714 (7th Cir. 1993) (holding that a genuine issue of fact as to a correctional officer's intent precluded summary judgment when the officer threw an inmate against cell bars after the inmate refused to exit his cell); *Mitchell v. Krueger*, 594 F. App'x 874, 877 (7th Cir. 2014) (vacating summary judgment when an a correctional officer slammed an inmate onto a table after restraining him, noting that even though the inmate had started a fight, "[a] jury reasonably could find that [the inmate] was not a threat to anyone— and wasn't perceived by the defendants to be a threat to anyone").

suicide and that he was unconscious when the officers arrived at his cell. Defendants agree that Ards was lying on the floor motionless and adduce no evidence that Ards was conscious. Although defendants argue that Ards failed to comply with their orders, the only non-compliance was that he did not respond when the officers spoke to him. And stabilizing an unconscious man lying on the floor motionless does not require pressing a plexiglass shield on his back with the force that could cause a long-term injury, especially when there were seven officers at the scene. Dkt. 91, ¶ 15. A reasonable jury could find that Schneider had no justification for using the shield with such force and infer that he used force to cause harm rather than to ensure safety.

As for Thill bending Ards's right wrist, defendants contend that he did so because Ards refused to present his left arm. Schneider admitted earlier in the case that Ards's left arm was already under his body when the officers entered the cell. Dkt. 39, ¶ 20. Ards says in his declaration that having Schneider's weight on top of him prevented him from moving his left arm, Dkt. 106, ¶ 24, and he testified during his deposition that he did not recall Thill ordering him to present his left arm, Dkt. 123 (Ards Dep. 65:3–5). Although Ards eventually managed to pull his left arm from underneath his body, this was after Schneider reduced pressure on his back. Dkt. 123 (Ards. Dep. 65:3–5). Thill could see Schneider pressing on Ards's back with the shield and infer that Ards could not comply with his orders. A reasonable jury could find that Thill used force to cause pain rather than to induce compliance.

As for Schneider slamming Ards's head against a metal door, defendants deny that this happened at all; Ards says it did. Ards adduces his own declaration and his deposition testimony that Schneider slammed his head against a metal door in the shower area. Dkt. 106, ¶ 37 and Dkt. 123 (Ards. Dep. 43:2–22). Ards was already restrained at this point, Dkt. 85,

¶ 28 ("Once at the shower, Ards was tethered to the door so he could not try to run away from staff during the search."), and defendants identify no justification for slamming Ards's head against a metal door. A reasonable jury could infer that Schneider slammed Ards's head against a metal door to cause harm rather than for a legitimate reason.

As for Schneider shoving his hand wearing a metal-mesh glove into Ards's mouth, defendants say that Schneider put his hand in Ards's mouth to check for contraband. They contend that the use of a metal glove was justified because Ards failed to comply with their orders to open his mouth. They also deny that Schneider "shoved" it into his mouth, pointing to the absence of any gum damage. Ards states in his declaration that he did not refuse any order from the officers. Dkt. 106, ¶¶ 36–37, 46. He also testified during his deposition that Schneider put his hand with the metal glove without an order to open his mouth. Dkt. 123 (Ards. Dep. 43:9–22). He also indicates that the use of the metal-mesh glove contributed to his later difficulty with swallowing his meals. *See* Dkt. 84-1, at 8. Using a metal-mesh glove was not a prison policy. A reasonable jury could find that Schneider used force to cause harm rather than to check for contraband.

Defendants suggest that the use of force in general against Ards was justified because he was a recalcitrant prisoner. Anderson says in his declaration that Ards had received 22 conduct reports before the April 26 incident. Dkt. 88, ¶ 36. Anderson does not say that any of these past incidents involved violence.[7] Defendants adduce no evidence that they knew

---

[7] Ards requested Anderson to admit that he has never seen or heard Ards "assaulting an office," but he objected to this request on the basis that it was vague, ambiguous, and speculative. Dkt. 106-5, ¶ 15. This is not a legitimate objection: Ards was obviously asking whether Anderson has ever witnessed or heard about Ards assaulting an "officer." So I will deem this fact admitted: Anderson has never seen or heard Ards assaulting an officer.

about Ards's past misconduct on April 26. Besides, a jury could find Ards's past run-ins with prison staff as evidence of animosity between the officers and Ards and that the animosity was a motivating factor for using excessive force. Ards's past conduct reports do not preclude Ards's excessive force claims.

I will deny summary judgment as to Ards's excessive force claims.

### 3. Failure to protect claim

Ards contends that Anderson failed to protect him from Thill's and Schneider's uses of excessive force. To prevail, Ards must show that Anderson had a "realistic opportunity to step forward and prevent" the use of excessive force but failed to do so. *Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005) (quoting *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000)). Anderson was present when Thill and Schneider used force, and as a higher-ranking officer, Anderson could order Thill and Schneider not to use the kinds of force discussed above, but he did not.

Anderson's sole argument is that because Thill and Schneider did not use excessive force, he, too, cannot be liable. As discussed above, a reasonable jury could find that Thill and Schneider used excessive force, so I will deny summary judgment as to Anderson as well.

### 4. Qualified immunity

Defendants contend that they are entitled to qualified immunity because there is no clearly established federal law that prohibits the following acts:

> (1) Thompson from giving Ards a bed sheet;
>
> (2) Stellick from relaying Ards's threats of self-harm to the shift sergeant while Ards was on clinical observation status with very limited property and relying on the shift sergeants judgment as to whether something more needed to be done;

(3) Thill and Schneider from using trained techniques to gain compliance from Ards after he refused direct orders; and

(4) Anderson from observing Thill and Schneider's trained techniques to gain Ards's compliance.

Dkt. 82, at 25–26. To overcome a qualified immunity defense, a plaintiff needs to show that the law "placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). This can be done by showing that "the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Lewis v. McLean*, 864 F.3d 556, 566 (7th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Here, it is beyond dispute that a reasonable official would have known that the law prohibited the conduct alleged here. A correctional officer could not be deliberately indifferent to an inmate's suicide risk. *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) ("There can be little debate that it was clearly established, long before 1998, 'that prison officials will be liable under Section 1983 for a pretrial detainee's suicide if they were deliberately indifferent to a substantial suicide risk.'" (quoting *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992))). Allowing an inmate to hang himself with a bed sheet has resulted in liability. *See Woodward*, 368 F.3d at 930. Even though I have not found a case in which an officer affirmatively handed a bed sheet to a mentally-ill, suicidal inmate on a suicide watch, that goes to show the egregiousness of the conduct, not that a reasonable official would not have known that it was wrong. Likewise, deferring to others' judgment does not excuse a correctional officer from conducting at least a minimal investigation. *See Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011). It was also well-established that using force against an inmate who no longer poses a threat can be excessive. *See Hill*, 992 F.2d at 718 (holding that a prison sergeant was not

entitled to qualified immunity when he pulled inmate from his cell by shoulder and hair, slammed inmate's head against bars after the inmate refused to exit his cell). The fact that the officers used trained techniques to cause pain makes no difference.

In sum, genuine disputes of material facts preclude summary judgment. Defendants can ultimately prevail by convincing the jury of their own version of facts, but the jury, not the court, will resolve the factual disputes. Defendants' motion for summary judgment is denied.

## B. Ards's motions concerning trial preparation

Ards filed three motions pertaining to trial preparation: (1) a motion for an order directing prison officials to provide legal documents, Dkt. 130; (2) a motion to compel production of legal documents, Dkt. 131; and (3) a motion for production of legal documents or appointment of counsel, Dkt. 136. I will assist Ards in recruiting counsel and deny the other motions.

All three motions arise from the safety restriction that Ards cannot have documents in his cell. On September 24, 2017, Ards refused to return cleaning supplies and covered his cell window with paper to prevent prison staff from looking inside the cell. No. 17-cv-458, Dkt. 37. It is unclear whether Ards attempted to harm himself on September 24, but WSPF officials placed Ards on various restrictions, and Ards is now prohibited from having, among other items, any cleaning supply that could poison him or paper in his cell. Dkt. 133-1, at 1–2. Ards can review legal documents related to this case, but he can do so only under supervision during one-hour review sessions held in a separate room outside of his cell. No. 17-cv-458, Dkt. 37-2, at 1.

Ards explains that these one-hour sessions are not enough to prepare for trial. He says while he reviews documents, he is handcuffed and tethered to a short desk. The low height of

the desk forces him to hunch over and to endure back pain while he reviews documents. Dkt. 131, at 1. He also says he needs the documents in his cell because he cannot commit all relevant information to his memory during the one-hour sessions. *Id*. at 2. Ards contends that either (1) prison officials should allow him to keep legal documents in his cell, or (2) the court should appoint him counsel.

I will assist in recruiting him counsel. Litigants in civil cases do not have a constitutional right to counsel, and the court has only discretion to assist in recruiting counsel who may be willing to serve without compensation. *See* 28 U.S.C. § 1915(e)(1); *Pruitt v. Mote*, 503 F.3d 647, 653–54, 656 (7th Cir. 2007) (en banc). Before assisting in recruiting counsel, this court generally requires a pro se litigant to satisfy two requirements. First, the pro se litigant must show that he has made reasonable attempts to recruit counsel on his own. *See Jackson v. Cty. of McLean*, 953 F.2d 1070, 1072–73 (7th Cir. 1992). Ards has satisfied this requirement as I concluded earlier in the case. Dkt. 55, at 7.

Second, once the pro se litigant has shown that he made some reasonable attempts to recruit counsel, the court "must examine whether the difficulty of the case—factually and legally—exceeds" his abilities to litigate his claims. *Perez v. Fenoglio*, 792 F.3d 768, 784 (7th Cir. 2015). Assessing the litigant's abilities is a "practical" inquiry, *Santiago v. Walls*, 599 F.3d 749, 762 (7th Cir. 2010), and no fixed requirement exists, *Pruitt*, 503 F.3d at 655, but courts generally consider the litigant's "literacy, communication skills, educational level, and litigation experience" in light of the complexities of the case. *Id*.

I conclude that assisting Ards in recruiting counsel is appropriate. Allowing documents in Ards's cell is not an option given his history of self-harm, whereas the restriction that he cannot have documents in his cell hinders Ards's trial preparation. The one-hour review

28

sessions outside of his cell do not help Ards prepare for the trial if he is telling the truth—that he must continuously endure back pain while reviewing documents. It is also plausible that he cannot remember all relevant information during one-hour sessions. Ards also has a reading level of a fifth grader, Dkt. 14, at 2, which adds to his difficulties in preparing for the trial. I also have concerns whether Ards is mentally competent: Ards says he made yet another self-harm attempt by overdosing on medicine on December 2, 2017. *See* No. 17-cv-458, Dkt. 50, at 1. Although Ards ably presented his side of the story during two telephonic hearings, I cannot assess Ards's mental competency at this point. Recruiting counsel allows Ards to litigate this case on the merits and avoids risking his safety. Accordingly, I will assist Ards in recruiting counsel.

I will also address two matters related to Ards's paper restriction. First, a memorandum from WSPF describing Ards's safety restrictions says, "Legal Materials . . . will be restricted to current pending legal case in which you are named a complainant." No. 17-cv-458, Dkt. 37-2, at 1. An inmate has a constitutional right of access to the courts. *See, e.g., In Bounds v. Smith*, 430 U.S. 817, 828 (1977). Prison officials may not impede an inmate from filing new cases.

Second, defendants indicate that Ards has been exploiting his one-hour review sessions to harass prison staff. After each session of reviewing legal documents, prison staff escorts Ards back to his cell with a tether attached to one of his wrists. But in numerous instances, Ards refused to remove the tether on his wrist once he returned to his cell, preventing staff members from closing the trap door. Prison officials had to assemble response teams to use force Ards to induce compliance. Dkt. 132, at 3. In one occasion, Ards refused to remove the tether or to allow staff to remove it and indicated that he would wait five to eight hours unless the warden himself comes and talks to Ards in front of his cell. Dkt. 133-2, at 5. These facts do not pertain

to the merits of this case, and I will defer to prison officials' judgment on how to respond to Ards's alleged misconduct. I remind Ards that prison officials can impose appropriate sanctions if these allegations are true.

## C. Ards' motion to amend the case caption

Finally, Ards moves to amend the case caption. Dkt. 78. He says defendants' counsel keeps naming certain defendants in her court submissions even though those defendants were dismissed earlier in the case. The clerk of court has already amended the case caption to reflect the correct defendants. So Ards's motion to amend the caption is denied as moot.

CONCLUSION

In sum, genuine disputes of material facts preclude summary judgment. I will attempt to recruit counsel willing to represent Ards. I will continue the stay of the proceedings in this case. After attempting to locate counsel for Ards, the court will hold another scheduling conference at a later date and decide how the case will proceed.

ORDER

IT IS ORDERED that:

1. Plaintiff Tyrone D. Ards's motion for reconsideration, Dkt. 76, is DENIED.

2. Plaintiff's motion to amend the caption, Dkt. 78, is DENIED.

3. Defendants Theodore Anderson, Randy Schneider, Michael J. Thompson, and Patrick Stellick's motion for summary judgment, Dkt. 81, is DENIED.

4. Plaintiff's motion to strike Lo Becher's declaration, Dkt. 99, is DENIED.

5. Plaintiff's motion to compel, Dkt. 112, is DENIED.

6. Plaintiff's motion for sanctions, Dkt. 113, is DENIED.

7. Plaintiff's motion for leave to file sur-reply, Dkt. 125, is GRANTED.

8. Plaintiff's motion for an order directing prison officials to provide legal documents, Dkt. 130, is DENIED.

9. Plaintiff's motion to compel production of legal documents, Dkt. 131, is DENIED.

10. Plaintiff's motion for assistance in recruiting counsel, Dkt. 136, is GRANTED.

11. All proceedings in this case are STAYED pending recruitment of counsel for plaintiff. After the court attempts to find counsel willing to represent plaintiff, the court will hold a status conference to establish a new schedule.

Entered December 29, 2017.

BY THE COURT:
/s/
_____

JAMES D. PETERSON
District Judge